**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TYRONE HALL, | ) | |
| | ) | CASE NO.  1:13CV0587 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE DONALD C.  NUGENT |
| | ) | |
| | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff Tyrone Hall ("Hall") challenges the final decision of the Commissioner of

Social Security, Carolyn W. Colvin ("Commissioner"), denying his claim for a Period of

Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income

("SSI") under Titles II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i),

423, 1381 *et seq.*  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and Local Rule

72.2(b).

For the reasons set forth below, it is recommended that the final decision of the

Commissioner be VACATED and the case REMANDED for further proceedings consistent with

this Opinion.

**I.  Procedural History**

In January 2010, Hall filed applications for POD, DIB, and SSI alleging a disability onset

date of August 5, 2006[1] and claiming he was disabled due to cluster headaches.  (Tr. 142-153, 176, 182.)  His application was denied both initially and upon reconsideration.

On September 8, 2011, an Administrative Law Judge ("ALJ") held a hearing during which Hall, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 28-71.)  On November 3, 2011, the ALJ found Hall was able to perform past relevant work as well as a significant number of jobs in the national economy and, therefore, was not disabled.  (Tr. 12-22.)  The ALJ's decision became final when the Appeals Council denied further review.  (Tr. 1-4.)

## II.  Evidence

### Personal and Vocational Evidence

Age forty-eight (48) at the time of his administrative hearing, Hall is a "younger" person under social security regulations.  *See* 20 C.F.R. § 404.1563(c) & 416.963(c).  (Tr. 35.)  He has a tenth grade education and past relevant work as a hospital cleaner and general foundry worker. (Tr. 20, 183.)

### Hearing Testimony

At the September 8, 2011 hearing, Hall testified to the following:

- He has experienced headaches for the past twenty years.  They are equally as painful now as when they first started twenty years ago.  They went away for awhile after he received treatment at a hospital, but they came back and "never went away."  (Tr. 36.)

- He gets seven or eight headaches per day.  The only thing that alleviates the pain is sleep.  Nothing in particular triggers his headaches–"they come when they get ready."  His headaches worsened in 2009.  (Tr. 52-53.)

- He takes medication for his headaches but is not sure if it helps.  (Tr. 53.)  He experiences numerous side effects from his medications, including drowsiness, nervousness, the shakes, sleepwalking and fainting.  (Tr. 53.)  He is unsure how often he has fainted.  Sometimes "I go in one room and I'll be – when I wake up,

---

[1]  At the hearing, Hall moved to amend his onset date to August 4, 2009.  (Tr. 59.)  The ALJ took the motion under advisement.  (Tr. 59.)  In the decision, the ALJ found Hall had engaged in substantial gainful activity ("SGA") from his initial alleged onset date, August 5, 2006, through August 4, 2009.  (Tr. 14-15.)  He addressed the remainder of the decision to the period during which Hall did not engage in SGA; i.e. the period of August 4, 2009 to the date of the decision.  (Tr. 15.)  Hall does not object.

          I'll be in another room."  He recently fainted in the kitchen and hit his head.  (Tr. 54.)

- He broke his foot in July 2011 and "keep[s] fracturing it."  It affects his ability to work because of the pain.  (Tr. 54-55.)

- He worked full-time at an automotive company from 1999 until August 4, 2009. (Tr. 39-40.)  In this job, he was on his feet all day and lifted "anywhere from one pound to, like, 98."  (Tr. 61.)  He left his job because his doctor told him "don't go back to work, go file for disability."  (Tr. 41.)  He has not worked since and has not looked for another job because his head hurt "too bad for me to be going out."  (Tr. 42.)

- Between 2004 and 2007, while working at the automotive company, he also worked part-time as a cleaner at a hospital.  He did not have to lift anything very heavy in this job.  (Tr. 60-61.)

- He lives in a rented house with his eight year old son.  He prepares meals and is able to take care of both his and his son's personal hygiene.  He plays XBox and goes outside with his son occasionally.  He has attended parent-teacher meetings in the past.  (Tr. 38-39, 46-48.)

- He has eight other children, the oldest of whom is twenty-five years old.  He also has nine grandchildren.  Aside from his eight year old son, none of his children or grandchildren live with him.  He sees them on weekends and his grandchildren sometimes spend the night.  When they visit, he prepares boxed meals.  (Tr. 44-45, 50-51.)

- He does not clean the house anymore.  (Tr. 45-46.)  His older children and girlfriend help clean the house.  (Tr. 45-46.)  He goes shopping and drives but "not far."  (Tr. 48, 65.)  He does not go to school or take any classes.  (Tr. 49.)  He does not go out with his girlfriend because he fears he will get a headache and hurt himself.  (Tr. 48-49.)

The VE testified Hall had past relevant work as a hospital cleaner (medium, unskilled, SVP 2, performed at a light level) and general foundry worker (heavy, unskilled, SVP 2).  (Tr. 63.)  The ALJ then posed the following hypothetical:

          Assuming somebody of the claimant's age, education and work experience, who is able to perform work, doctor, with no exertional limitations, avoiding concentrated exposure to loud noise, avoiding concentrated exposure to wetness, humidity, fumes, odor, dust, gases and poorly ventilated areas, avoiding concentrated exposure to hazardous machinery and unprotected heights, limited to tasks that are simple and routine and precluded from tasks that involve high-production quotas and strict time requirements, precluded from tasks that involve arbitration, negotiation or confrontation. Limited tasks that involve superficial interaction with coworkers and the public.

         * * *

         Let's also say precluded from commercial driving, doctor, okay?

         * * *

Would such a person be able to do the past relevant work?

(Tr. 65-66.)  The VE testified such a hypothetical individual would "possibly" be able to perform Hall's past relevant work as a hospital cleaner, but could not perform his past relevant work as a general foundry worker.  (Tr. 66.)  The VE further testified such a hypothetical individual could perform other jobs in the national economy, including laundry worker, folder, and, bagger.  (Tr. 66-67.)

The ALJ then asked whether a hypothetical individual would be able to perform Hall's past relevant work using the same hypothetical as above except "at [the] medium" level.  (Tr. 67.) The VE testified such a hypothetical individual would be able to perform Hall's past relevant work as a hospital cleaner, as well as the laundry worker, folder and bagger jobs.  (Tr. 67.)  The ALJ then asked "[a]s a third hypothetical, this person . . . could miss three or more days of work a month. . . would that – how would that affect your answer?"  (Tr. 68.)  The VE testified "I think it– that would be unrealistic absences and it would affect job retention and sustainability of the jobs that I've identified."  (Tr. 68.)

Hall's attorney then asked the VE the following:

Q:  If an individual were off task for 20 percent of the day, due to symptoms, such as headaches, tremors, side effects from medication, how would that affect their ability to maintain employment?

A:  He wouldn't be able to maintain or retain or sustain employment.

Q:  And if an individual had to take an extra break in the morning, an extra 15-minute break in the morning and an extra 15-minute break in the afternoon, due to headaches, how would that affect their employment?

A:   That would be a job accommodation and it would affect job retention and sustainability.

(Tr. 68.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a

4

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[2]

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Hall was insured on his alleged disability onset date, August 5, 2006, and remained insured through the date of the ALJ's decision, November 3, 2011. (Tr. 12.) Therefore, in order to be entitled to POD and DIB, Hall must establish a continuous twelve month period of disability commencing between those dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

### IV.  Summary of Commissioner's Decision

The ALJ found Hall established medically determinable, severe impairments, due to cluster headaches/hemicranias, fracture of left foot and status post surgical repair, and major depressive disorder; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 15-17.) Hall was found capable

---

[2]  The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

of performing his past work activities as a hospital cleaner as actually and generally performed, but not capable of performing past work as a general foundry worker.  (Tr. 20.)  He was determined to have a Residual Functional Capacity ("RFC") for a limited range of medium work with certain non-exertional limitations.  (Tr. 17.).  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Hall was not disabled. (Tr. 17-22.)

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.

Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

### Treating Physicians

Hall argues the ALJ failed to provide "good reasons" for rejecting the opinions of treating physicians Deborah Ewing-Wilson, M.D.,  and Jennifer Kriegler, M.D.  He maintains the ALJ's conclusion that these doctors' opinions were "inconsistent with the record" is vague, "completely wrong," and "unsupported by any citation to the record."  (Doc. No. 14 at 7,9.)  Hall notes the medical record contains over two years worth of treatment attempts by both doctors and argues "[t]heir opinions are absolutely supported by the record, uncontradicted by any substantial or more compelling evidence in the file, and should have been given controlling weight." *Id.*

The Commissioner argues the ALJ properly rejected the opinions of Doctors Ewing-Wilson and Kriegler because they were inconsistent with Hall's activity level and the clinical findings.  She cites evidence indicating Hall prepares meals for himself and his son; attends parent-teacher meetings; plays video games; shops and enjoys the company of his girlfriend;

7

cleans; washes laundry; and, cuts the grass. The Commissioner also cites medical records indicating Hall walked with a normal gait, maintained intact reflexes and normal bulk, tone, strength and coordination. She maintains these records "fail to show loss of movement or signs of deconditioning that are apparent in disabled, immobilized individuals." (Doc. No. 16 at 12.)

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[3]

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,'

---

[3] Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855;  *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Hall presented to Dr. Ewing-Wilson in February 2008 for treatment of cluster headaches. (Tr. 280-282.)  He reported a "longstanding history" of headaches, going back twenty-five years. (Tr. 280.)  He indicated there had been a five year period of remission, and then the headaches began again.  (Tr. 280.)  During the February 2008 visit and subsequent follow-up visits, Hall

9

variously described his pain as sharp, throbbing, stabbing, burning, aching, and pulsating.  (Tr. 280, 277, 275, 271, 621, 612.)  Treatment notes from 2008 to 2010 indicate Dr. Ewing-Wilson prescribed a variety of medications, including Verapamil, Nortriptyline, Effexor, Depakote, Lithium, Gabapentin, Amitriptyline, Nadolol, Indocin, Naproxen, Klonopin, Periactin, and Lyrica.  (Tr. 280-282, 277-279, 275-276, 271-274, 621-623, 611-614, 587-590.)  Hall reported little to no relief from these medications, claiming the only thing that helped was sleep.  (Tr. 280-282, 277-279, 275-276, 271-274, 621-623, 611-614, 587-590.)  In January 2009 treatment notes, Dr. Ewing-Wilson stated she had "[e]xhausted almost all possibilities."  (Tr. 271.)

In December 2008, Dr. Ewing-Wilson referred Hall to the Cleveland Clinic Headache Clinic, where he was seen by Dr. Kriegler.  (Tr. 385.)  He stated his headaches generally lasted approximately 20 minutes and occurred as often as six times per day.  (Tr. 385.)  He reported his headaches were "coming more frequently" and, despite numerous medication trials, "the only thing that makes them better is sleep." (Tr. 385.)  Dr. Kriegler prescribed a DHE pump and migranal spray.  (Tr. 371-374, 368-369, 366.)  The pump was discontinued after Hall reported he could not tolerate it.  (Tr. 268, 350, 364-366.)

In August 2009, Dr. Ewing-Wilson certified to Hall's employer that he was unable to work due to "intractable severe cluster headaches."  (Tr. 313-319.)  During a visit to the Headache Clinic that same month, Hall reported he was having headaches four to five times per day, with each headache lasting "at least 45 minutes."  (Tr. 350.)  He stated it "feels like [his headaches] are getting worse" and described them as "burning, stabbing, lightening [sic] bolt going through head and eye."  (Tr. 350.)  In December 2009, Dr. Kriegler referred him to the Cleveland Clinic Pain Management Center for a sphenpalatine ganglion block procedure.  (Tr. 342.)  He reported "good relief" from this procedure for three weeks, and returned for a second block in February 2010.  (Tr. 460.)  The record also indicates Hall was treated with magnesium infusions and Botox.  (Tr. 588.)

In March 2010, however, Hall stated he was no longer obtaining relief from either the pain blocks, infusions, Botox, or medications.  (Tr. 457, 588.)  He reported daily severe headaches, "many throughout the day," lasting up to one to two hours in duration.  (Tr. 457, 588.)  In

10

treatment notes dated March 18, 2010, Dr. Ewing-Wilson indicated that "all options have provided no relief." (Tr. 588.) She noted Hall had been off work since August 4, 2009 and stated that "[a]t this point, I doubt he can return to work. He has intractiable [sic] pain and is permanently and totally disabled." (Tr. 588.) In June 2010, Hall reported daily, severe headaches of continuous duration. (Tr. 453.)

In February 2011, Dr. Kriegler completed a Medical Source Statement regarding Hall's Mental Capacity. (Tr. 571-572.) She reported he had "poor" abilities in numerous categories, with the term "poor" defined as: "ability to function is significantly limited." (Tr. 571.) Specifically, Dr. Kriegler offered that Hall had a "poor" ability to (1) maintain attention and concentration for extended periods of 2 hour segments; (2) respond appropriately to changes in routine settings; (3) maintain regular attendance and be punctual within customary tolerance; (4) deal with the public; (5) relate to co-workers; (6) interact with supervisors; (7) work in coordination with or proximity to others without being unduly distracted or distracting; (8) deal with work stress; (9) complete a normal workday or work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (10) socialize; and, (11) relate predictably in social situations. (Tr. 571-572.) She also determined that Hall had a "fair" (i.e. moderately limited) ability to follow work rules; and behave in an emotionally stable manner. (Tr. 571-572.) In support of her opinions, Dr. Kriegler noted that Hall "has severe chronic cluster headaches that occur 2-3x/d. During this time (20 [min] - 4 hr. ea episode) he is completely incapacitated by severe debilitating pain." (Tr. 572.)

In March 2011, Hall presented to Kirk Carruthers, M.D., for an initial psychiatric evaluation, stating that "[t]hey said I was depressed at the Cleveland Clinic." (Tr. 583-586.) Hall reported that his cluster headaches and other medical problems had significantly affected his mood for the past five to six years. (Tr. 583.) He also reported episodes of nightmares with a voice in his sleep telling him "bad things." (Tr. 583.) Dr. Carruthers described Hall as depressed and withdrawn. (Tr. 585.) He diagnosed him with Major Depressive Disorder and assigned a

Global Assessment of Functioning ("GAF") of 45 to 50.[4]  (Tr. 585.)  Dr. Carruthers saw Hall

again in May and June 2011.  (Tr. 581-582; 579-580.)  On both occasions, Hall reported feeling

the same.  (Tr. 579, 581.)  Dr. Carruthers' treatment notes reflect Hall was prescribed Wellbutrin,

Seroquel, Trazadone, and Cymbalta.  (Tr. 582, 583, 580.)

On June 14, 2011, Dr. Carruthers completed a form report, in which he concluded that

Hall had (1) moderate limitations in judgment and long-term memory; and, (2) severe limitations

in short term memory.  (Tr. 258.)  He described Hall's prognosis as poor.  (Tr. 258.)  Dr. Kriegler

completed the same form report on June 15, 2011.  (Tr. 260.)  Therein, she noted Hall has "severe

chronic cluster headaches 2- 3x/day" that cause "severe debilitating pain."  (Tr. 260.)  Dr.

Kriegler reported Hall had tried thirty-three (33) different medications.  (Tr. 260.)  Like Dr.

Carruthers, Dr. Kriegler rated Hall's prognosis as poor.  (Tr. 260.)

In the decision, the ALJ summarized Hall's hearing testimony and the medical evidence

regarding his cluster headaches and major depressive disorder.  (Tr. 18.)  The ALJ then assessed

the opinions of Hall's treating physicians as follows:

> Jennifer Kriegler M.D., opined that the claimant's ability to function is
> significantly limited in most categories, and he is completely incapacitated by
> severe debilitating pain from severe chronic cluster headaches that occur two-to-
> three times a day (2/17/2011, Exhibit 16F).  The undersigned assigns less weight
> to this opinion.  Even though she is a treating source, her opinion is not consistent
> with the record.
>
> His treating physicians opined that the claimant's prognosis is poor and noted he
> has not been released to return to work.  (Exhibit 16E).  The undersigned assigns
> less weight to these opinions as well.  Again, even though they are treating
> sources, their opinions are inconsistent with the record.  Also, another had opined
> that the claimant could return to work on January 4, 2010 after having been off of
> work since August of 2009.  (12/17/2009, Exhibit 2F, Page 38.)

---

[4]  The GAF scale reports a clinician's assessment of an individual's overall level of
functioning.  *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric
Association, 4th ed revised, 2000) ("DSM-IV").  An individual's GAF is rated between 0 - 100,
with lower numbers indicating more severe mental impairments. A GAF score between 0 - 50
indicates serious symptoms or any serious impairment in social, occupational or social
functioning.  DSM-IV at 34.  It bears noting, however, that a recent update of the DSM
eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable
psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders*
(DSM-5) at 16 (American Psychiatric Association, 5th ed., 2013).

(Tr. 20.)

With respect to Dr. Kriegler, the Court finds the ALJ failed to provide "good reasons" for rejecting her opinions. The ALJ clearly identified Dr. Kriegler as a treating physician. Indeed, the record reflects Dr. Kriegler treated Hall for cluster headaches for over two years. However, the ALJ does not appear to have considered the factors set forth in 20 C.F.R. § 404.1527(d)(2) before assessing Dr. Kriegler's opinion that Hall had a wide variety of significant functional limitations. Specifically, the decision does not acknowledge the fact that Dr. Kriegler specializes in the treatment of headaches; treated Hall regularly for over two years; and explored a variety of treatment options with no success. Nor does the ALJ explain how Dr. Kriegler's opinions are not supported by the medical evidence. Rather, the ALJ offers only a conclusory and unexplained statement that Dr. Kriegler's opinion "is not consistent with the record." Courts have routinely found that such a perfunctory assessment does not constitute "good reasons" for rejecting a treating physician's opinion. *See, e.g., Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 245–46 (6th Cir. 2007) (finding an ALJ failed to give "good reasons" for rejecting the limitations contained in a treating source 's opinion where the ALJ merely stated, without explanation, that the evidence of record did not support the severity of said limitations); *Patterson v. Astrue*, 2010 WL 2232309 (N.D. Ohio June 2, 2010) (remanding where the "ALJ did not provide any rationale beyond his conclusory statement that [the treating physician's] opinion is inconsistent with the objective medical evidence and appears to be based solely on [claimant's] subjective performance."); *Fuston v. Comm'r of Soc. Sec.*, 2012 WL 1413097 (S.D. Ohio Apr. 23, 2012) (finding the ALJ deprived the court of meaningful review where the ALJ discarded a treating physician's opinion without identifying any contradictory evidence or explaining which findings were unsupported).

The Commissioner asserts no error occurred because Dr. Kriegler's opinion is inconsistent with Hall's "activity level and the clinical observations." In assessing Hall's credibility, the decision does discuss the fact that Hall was apparently able to work during the last twenty years despite his history of headaches. It also references notations in treatment notes

13

indicating that objective test results,[5] as well as Hall's motor skills, gait, reflexes, and sensation, have been consistently reported as normal. (Tr. 18-19.) However, the ALJ does not any offer any meaningful explanation for his conclusion that Dr. Kriegler's opinions are inconsistent with this evidence. *See Blackburn v. Colvin*, 2013 WL 3967282 at * 7 (N.D. Ohio July 31, 2013) (noting that "this Court cannot conduct a meaningful review and conclude that good reasons have been set forth for rejecting a treating physician's opinion where an ALJ recites some of the pertinent medical evidence of record and follows that recitation with an unexplained conclusion that said opinion is inconsistent with the medical record"). This is particularly problematic here, in light of evidence that Hall reported an increase in both the frequency and intensity of his headaches beginning in late 2008. (Tr. 385, 350). Moreover, neither the ALJ nor the Commissioner cite any medical evidence that Hall's cluster headaches would have affected his motor skills, gait, reflexes, or sensation, or that his physicians questioned the truthfulness of his reported headache symptoms because of either examination findings or objective test results.

The Commissioner also argues Dr. Kriegler's opinions are inconsistent with evidence regarding Hall's daily activities and "heavy" cigarette habit. (Doc. No. 16 at 12-13.) However, the ALJ did not offer these as explanations. As this Court has previously noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration." *Blackburn v. Colvin*, 2013 WL 3967282 at * 8 (N.D. Ohio July 31, 2013). *See also Dutkiewicz v. Comm'r of Soc. Sec.,* 2013 WL 6089680 at * 6 (N.D. Ohio Nov. 19, 2013); *Hutchinson v. Comm'r of Soc. Sec.*, 2013 WL 4604561 at *14 (E.D. Mich. Aug. 29, 2013); *Jury v. Comm'r of Soc. Sec.,* 2013 WL 4427353 at * 11 (N.D. Ohio Aug. 14, 2013); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996) ("we cannot uphold a decision by an administrative agency ... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and

---

[5] In April 2008, Dr. Ewing-Wilson noted that an MRI of Hall's brain was "unremarkable." (Tr. 277.) She further noted that an MRA of his brain showed mild stenosis of the left carotid bulb and the "take off of the right common carotid." (Tr. 277.)

the result.").

In short, the ALJ has failed to offer "good reasons" as to why Dr. Kriegler's opinion was given "less weight."  Moreover, this portion of the decision is so conclusory and devoid of explanation that it deprives this Court of the ability to conduct a meaningful review of the ALJ's decision.  Thus, the Court recommends that remand is necessary, thereby affording the ALJ an opportunity to sufficiently explain the weight ascribed to the functional limitations assessed by Dr. Kriegler.

With respect to Dr. Ewing-Wilson, Hall does not direct this Court's attention to any document in which Dr. Ewing-Wilson offers an opinion that Hall has any specific functional limitations.  Rather, Hall cites Dr. Ewing-Wilson's treatment notes from March 18, 2010, in which she states that "[Hall] has been off work since August 4, 2009.  At this point, I doubt he can return to work. He has intractable [sic] pain and is permanently and totally disabled."  (Tr. 588.)  He also cites a series of forms in which Dr. Ewing-Wilson certifies generally to Hall's employer that he is unable to perform any of  his job functions because of his severe cluster headaches.  (Tr. 317, 319, 325.)  In these documents, Dr. Ewing-Wilson does not identify any specific job functions that she believes Hall is unable to perform, nor does she set forth an opinion that Hall has any specific functional limitations.

As noted *supra*, an ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled and may reject such determinations when good reasons are identified for doing so.  *See King*, 742 F.2d at 973; *Duncan*, 801 F.2d at 855.  Here, however, the ALJ has not identified good reasons for rejecting Dr. Ewing-Wilson's determination that Hall was unable to perform any of his job functions.  In fact, despite the fact that Dr. Ewing-Wilson treated Hall regularly for several years, the decision does not mention Dr. Ewing-Wilson by name or discuss her treatment of Hall in any detail.  On remand, the ALJ should more fully consider Dr. Ewing-Wilson's treatment notes and opinion that Hall was unable to perform his job functions.[6]

_____

[6]  The Commissioner also argues the ALJ properly rejected the opinion of Dr. Carruthers.  (Doc. No. 16 at 12-13.)  Hall does not raise this argument in his Brief on the Merits.  Thus, the Court will not address it in this Report & Recommendation.  It does bear noting, however, that

15

Accordingly, and for the reasons set forth above, the Court recommends this matter be remanded for further proceedings consistent with this opinion.  In the interests of judicial economy, Hall's second assignment of error will not be addressed.

### VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence.  Accordingly, the decision of the Commissioner should be VACATED and the case REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four for further proceedings consistent with this Report and Recommendation.

s/ Greg White
United States Magistrate Judge

Date: December 12, 2013

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

---

the ALJ's explanation for the rejection of Dr. Carruthers' opinion was as perfunctory as his rejection of Dr. Kriegler's opinion.  (Tr. 20.)